UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| KARLENE PETITT | ) | |
| | ) | |
| Plaintiff | ) | JURY TRIAL DEMANDED |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION |
| Christopher B Puckett | ) | FILE NO. 2:21-cv-1365 TLF |
| | ) | |
| Defendant. | ) | |

COMPLAINT FOR DAMAGES

COMES NOW Karlene Petitt, Plaintiff in the above-styled action, and for her Complainant against Defendant, Christopher B. Puckett, for fraud and deceit with intent to harm shows the Court as follows:

PARTIES AND JURISDICTION

1. Plaintiff Karlene Petitt is an airline pilot employed by Delta Air Lines, Inc. (hereinafter "Delta") a resident of the state of Washington.

2. Defendant Christopher B. Puckett is a labor relations attorney, employed by Delta Air Lines doing business in the state of Washington. Defendant will be served with summons and complaint as allowed by law.

3. This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1332 because this case is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4. Venue in this division of this district is proper, pursuant to 28 U.S.C. § 1391 because this is the judicial district in which a substantial part of the events or omissions giving rise to this claim occurred.

FACTUAL ALLEGATIONS

5. Plaintiff Petitt has been a professional airline pilot for over 34 years. Northwest Airlines, Inc. ("NWA") employed Petitt effective January 17, 1997. On October 29, 2008, NWA and Delta merged, and subsequently became a single operating

certificate under the name Delta Air Lines. Ms. Petitt currently holds the title of A330 First Officer, and she is type-rated on the A350, B777, B747-400, B747-200, B767, B757, B737, B727 and A330 aircraft.

6. Plaintiff Petitt is both a pilot and an expert on aviation safety. She holds MBA and MHS degrees, and a PhD in Aviation from Embry-Riddle Aeronautical University with a focus on airline safety. In addition to 34 years of experience flying aircraft for multiple air carriers, Plaintiff Petitt has also spent 21 of those years training pilots in Boeing jet aircraft and developing training programs for multiple international airlines. During her career, she has developed various training guides and has authored numerous articles, pilot reference handbooks, line-oriented evaluations, study guides, prep course, and similar materials. She has also authored and published eight books. Plaintiff Petitt also developed the first 3-pilot Advanced Qualification Program for pilot training and checking at Northwest Airlines.

7. Throughout her employment with NWA and now Delta, Petitt has continuously attempted to call any flight safety issues to the attention of her superiors and has proposed solutions to many safety and training deficiencies, including deficiencies constituting violations of Federal Aviation Administration (FAA) regulations and other aviation safety standards.

8. On January 28, 2015, Plaintiff Petitt met with Steve Dickson, Delta's Senior Vice President of Flight Operations, and Jim Graham, Vice President of Flying Operations and Chief Pilot, and brought to their attention Delta's non-compliance with federal

aviation standards, including the circumvention of fatigue rules, falsification of training records, and retaliation against individual pilots who raised safety concerns.

9. On March 8, 2016, Delta assigned Kelly Nabors, Manager of Equal Opportunity and Pass Protection, to interview Plaintiff Petitt purportedly regarding her safety report and Petitt's allegations of retaliatory harassment. Ms. Nabors' interview was conducted in a hotel lobby over the course of approximately three hours. In purported reliance on Ms. Nabors' report of her interview with Petitt -- including Ms. Nabors' observation that Petitt was "frequently anxious, tearful and upset" – Delta ordered Petitt to submit to a medical evaluation pursuant to section 15 of the collective bargaining agreement (CBA) between Delta and the Air Line Pilots Association (ALPA).

10. Section 15.B.3 of the Delta/ALPA CBA provides that the Delta Director of Health Services (DHS) may require a medical evaluation of a pilot holding a valid First-Class Medical Certificate. The DHS is required to confer with ALPA Medical Advisor regarding the choice of the Company Medical Examiner (CME), prior to sending the pilot for the evaluation. (Delta/ALPA CBA § 15.B.4). Medical information provided by the DHS to the CME must be limited to medically relevant information provided by doctors and treating facilities. (*Id*. at § 15.B.6). In the event of an adverse determination regarding a pilot's physical fitness by the CME, a pilot may choose a qualified medical examiner – the Pilot Medical Examiner (PME) – to conduct a medical examination for the same purposes. (*Id*. at § 15.B.8). In the

event of difference in the opinions of the CME and PME, a Neutral Medical Examiner (NME), jointly selected by the CME and PME, will resolve the conflict. (*Id.*). During the pendency of the review process, the CBA prohibits any adverse determination by the CME from being reported to the Federal Aviation Administration. (*Id*. at § 15.B.7).

11. On March 11, 2016, Defendant Puckett called Dr. Altman; he followed up his call with an email. The email reflected that Mr. Puckett and others would call Dr. Altman on March 16, 2016, and for Dr. Altman to plan about an hour for the telephone call and that Mr. Puckett would send Dr. Altman some materials to give him some background on the issues to be discussed." During the very meeting that Mr. Puckett had orchestrated, "Dr. Faulkner identified to Captain Graham that "the biggest concern really was the concern that Flight Operations was actually out, in some way, to harm Ms. Petitt.

12. Despite the pretext to place Ms. Petitt into a psychiatric evaluation, Puckett was in possession of two emails, written in November 2015 by Graham identifying his intentions to pursue a Section 15 five months prior to Delta's established pretext with Puckett's knowledge at the time intent.

13. Delta's Regional Director Phil Davis removed the Plaintiff Petitt from flight-duty per the CBA Section 15 process via a letter written by and provided to Davis by Puckett, that was to initiate with the DHS, purportedly based solely upon the hearsay report of Ms. Nabors' interview. Contrary to the CBA process, of which Puckett was a self-

I9671 military Road S.
SeaTac WA 98188
Karlene.Petitt@gmail.com

5

disclosed expert, he engaged in communications with Dr. Altman prior to the DHS meeting with Ms. Petitt and prior to *any* decision to subject her to a psychiatric evaluation.

14. Notwithstanding the CBA process Puckett invited Altman to participate in a corporate meeting on March 16, 2017. Per Puckett's invitation, Altman advised the Delta group to pursue the psychiatric evaluation.

15. The DHS conducted no independent investigation of the authenticity of Delta's request, or legitimacy of Nabors' report, as required by applicable guidelines of the Aviation Rulemaking Committee (ARC). Prior to his determination, DHS engaged in no meaningful review of Petitt's medical records as provided for by the CBA or even contacted the Plaintiff. (*Id*. at § 15.B. and 2). The DHS relied solely on Puckett and Nabors' report.

16. Puckett, the "prime expert on this collective bargaining agreement" had knowledge Section 15 would harm a pilot, in that it was potentially a career ending process.

17. On April 28, 2017, Delta's DHS officially designated Dr. Altman as the CME responsible for examining Petitt, yet requested Altman *not* contact Petitt. Despite Puckett's November 2018 admissions that he'd rolled Altman's pay for the March 16, 2017 meeting into his payment for being the CME, allegedly selected two months later, DHS, Tom Faulkner, and Altman thereafter created an official paper trail falsely indicating that Altman was first requested for his services on May 4, 2016.

18. Defendant Puckett conspired with Altman by providing him manufactured company

records upon which Dr. Altman relied, in part, to render his determination that Petitt was unfit to fly. These records included misrepresentations regarding company policies, a backfilled letter of events that never occurred, and partial and altered statements from Delta employees. Altman did not acquire Petitt's company medical records, personal medical records, or any Aviation Medical Examiner's records required by the Federal Aviation Certification processes since 1979, that should have precluded Dr. Altman's subsequent determination, as CME, that Petitt suffered from bipolar disorder. At the time of action, Petitt had received 78 first class medical certificates over the course of her aviation career, without issue to date.

19. Defendant Puckett knowingly and with malicious intent authorized a payment to Dr. Altman for the purchase a fraudulent mental health diagnosis. As a trained professional, Dr. Altman had knowledge that a bipolar disorder is a medical condition that would be inconsistent with Petitt's highly successful professional and personal life and attainment of 78 FAA first class medical certificates, yet he provided the report requested by Puckett to remove Petitt permanently from flight.

20. Defendant Puckett's false and malicious actions have damaged Petitt by, *inter alia*, foreclosing current and future work opportunities as a consultant, pilot, and/or instructor with other airlines, private sector consulting groups and public sector employers such as the FAA or any government security work. On July 14, 2016, Petitt was advised by Director of Standards Wally Hines of JETPUBS Inc., who had joint-ventured with Don Schmincke, President Methods Professional Inc., and Petitt

to create a Safety Management System (SMS) company involved in training airlines on SMS, that they would have to remove Petitt from further participation in activities due to the mental health allegations originating from Delta, which have been perpetuated by Defendant Puckett's actions to purchase a false bipolar diagnosis from Dr. Altman.

21. Plaintiff Petitt took the neuropsychological tests on May 18, 2016, and on June 24, 2016, Delta's DHS forwarded the results of this neuropsychological tests to Altman. Altman subsequently scheduled the first evaluation for July 7, 2016.

22. Chris Puckett selected Dr. Altman despite qualified Doctors at her base in Los Angeles or her home in Seattle, who then applied discriminatory and punitive standards to Petitt by accepting neuropsychological test results, with knowledge of improper test administration, in that Petitt was subject to a 10-hour neuropsychological testing process in a single day. Dr. Altman falsely advised Delta that his decision that Petitt was unfit to fly was in part a result of the neuropsychological testing results. Puckett had copies of, therefore knowledge that the testing was not disqualifying.

23. Puckett had been notified by the Airline Pilots Association that Dr. Altman had written a letter of extortion to another Delta Pilot and had advised Puckett to no longer use Dr. Altman's services. Despite this assertion and request, or in response to it, Puckett requested Altman's services with Petitt.

24. Puckett assisted Dr. Altman in prolonging his evaluation of Petitt for over a six-

month period in violation of the CBA (*Id*. at § 15.B. 10.) which mandates that the review process should be conducted "as expeditiously as possible."

    a. July 7, 2016, Dr. Altman retained Petitt in a locked and private room with himself and no other personnel. Dr. Altman subjected Petitt to a six-hour interrogation *without* a break, *without* food, with uncomfortably low temperatures, and asked unusual and disconcerting questions such as inquiries into her practice of "expressing her milk" 33-years prior to this evaluation.

    b. July 15, 2016, Dr. Altman met with Petitt in the same private locked room, for five-hours, and challenged her on safety related information within Petitt's safety report she presented to Steve Dickson, Delta's Senior Vice President of Flight Operations, and Jim Graham, Vice President of Flying Operations and Chief Pilot, about which Dr. Altman had no understanding, expressed confusion regarding basic aircraft operations, and resulted in his frustration and humiliation with his personal limitations which increased the animus motivating his unprofessional and malicious 366-page report.

    c. September 13, 2016, Dr. Altman required Petitt to spend two days, to fly across the country to meet with him on September 14, for a one-hour final evaluation. This evaluation consisted of a series of questions based upon substance usage that could have been conducted by teleconference, or during one of the previous sessions.

25. On August 25, 2016, Dr. Altman wrote that he would not utilize the

neuropsychological test results and focus "exclusively on the symptoms associated with the FAA psychiatric medically disqualifying conditions." Letters received by Petitt via email and FedEx on December 24th, 2016, sent by Altman, and reported to Delta falsely represented that his determination was based, in part, on the neuropsychological testing of Petitt. Puckett was informed of the testing results, knew of the conflict, and perpetuated the façade. Petitt suffered an injury as a result of Puckett's and Altman's malicious and false representations, and Delta's subsequent reliance on those test results to remove her from duty.

26. During the period of February 13-15, 2017, pursuant to the CBA (*Id*. at § 15.B. 8. b), Plaintiff retained the Mayo Clinic as the PME to review Altman's diagnosis. A total of ten Mayo Clinic doctors were involved in Petitt's case—four evaluating physicians, three of which participated on a nine-doctor panel, which included a bipolar specialist, acting pursuant to the CBA as the PME, subsequently determined that Petitt did not suffer from bipolar disorder or any other mental health issue that rendered her unfit for fight duty.

27. Regarding the neuropsychological testing in which Dr. Altman notified Delta was, in part, one of the three reasons he found Ms. Petitt unfit to fly, the Mayo Clinic physicians chose not to reproduce those tests because they stated Petitt's testing was, "Exceptional in most areas and those that were not, were just fine."

28. Pursuant to the CBA (*Id*. at § 15.B. 8. d), where the CME and PME provide conflicting determinations regarding medical fitness, the CME in conjunction with

the PME, will jointly select a Neutral Medical Examiner who should be "a specialist." Altman proffered non-specialist doctors with assistance of Puckett, and arbitrarily and capriciously rejected the Mayo Clinic's suggestions of highly specialized doctors as proposed NME's, creating six-month delay in the selection process, in violation of the CBA mandate that the review process be conducted expeditiously, thereby causing Petitt further harm.  (*Id*. at § 15.B. 10.)

29. Petitt renewed her First Class Medical certificate with the FAA NW Regional Flight Surgeon, Dr. Brett Wyrick on February 22, 2017.

30. Despite the Mayo Clinic's application of specialized medical expertise in overturning Dr. Altman's bipolar diagnosis, the FAA's issuance of a First Class Medical certificate, and contractual requirements prohibiting the CME from releasing medical information to the FAA during the pendency of the review process (*Id*. at § 16.B. 7. b.), on April 2017 Altman maliciously contacted the FAA with Defendant Puckett's knowledge and encouragement, proffered his false diagnosis to FAA Regional Director, Dr. Wyrick, and offered a more expansive report, beyond the 366-page original report, up to and including 1300 pages of documents produced by Delta to maliciously harm the Plaintiff.

31. In July 2017, pursuant to the terms of the CBA, the CME and PME jointly selected Dr. Andrew Huff as the Neutral Medical Examiner (NME) who would resolve the Complainant's disputed diagnosis.

32. On August 5, 2017, Dr. Huff evaluated Ms. Petitt and deemed her fit for duty, then queried Delta's DHS as to the format of the required report. On August 10, 2017, the DHS requested a secondary evaluation beyond the limits of the CBA. The secondary evaluation was conducted on August 25, 2017, at which time Dr. Huff advised Petitt that the DHS stated there would be, "no expense spared" and that the company was willing to fly anyone out, for assistance as necessary.

33. August 22, 2017, FAA Flight Surgeons Michael Berry, Dr. Goodman, Dr. Giovanetti, Dr. De Voll, and Dr. Wyrick unanimously determined that Dr. Altman's report lacked merit and ruled in favor of Plaintiff to retain her first class medical.

34. On September 2, 2017, Dr. Huff, issued his report that concluded Complainant was eligible to hold a First Class Medical certificate.

35. Petitt filed an AIR 21 complaint with the Occupational Safety and Health Administration ("OSHA") on June 6, 2016.  A hearing in this matter was held in Des Moines, Washington from March 25 to March 29, 2019, April 25, 2019, and from May 3 to May 5, 2019.

36. On December 21, 2020, Honorable Judge Scott Morris issued a decision and order granting relief, affirming Delta Air Lines was in violation of the Air 21 Statute, in which Puckett's name populates 232 times identifying his involvement. (*Petitt v. Delta Air Lines, 2018-AIR-00041*) On February 22, 2021, Delta Air Lines has appealed this decision.

37. On October 7, 2020, Jessica Pantioja, Public Service Administrator for the Department

of Financial and Professional Regulation notifed Ms. Petitt that Dr. Altman had forfeited his license due to an investigation resulting in part from Ms. Petitt's report.

38. The Illinois medical board has refused to provide Petitt documentation, per her FOIA request, regarding Dr. Altman and her case specifically.

## FACTUAL ALLEGATIONS UNKNOWN
## AT TIME OF OCCURENCE

39. On October 31, 2018, Ms. Petitt learned that Defendant Chris Puckett conspired with Dr. David B. Altman prior to his being selected as the CME and prior to the DHS decision to pursue the Section 15, to suggest the Delta derived course of action, of which Altman would greatly profit for an adverse diagnosis.

40. On October 31, 2018, Ms. Petitt learned that Defendant Chris Puckett, with Delta's Region Director Phil Davis, had met and conspired with Altman in a hotel room to review company related flight materials, corporate training documents, and reports such as the identification that Delta Air Lines had 14 like events that had caused the AF447 airbus crash and had taken no action, prior to Altman's meeting with Ms. Petitt, that Altman could use during his evaluation of Petitt, which turned into challenging her safety report, more so than a mental health evaluation.

41. On October 31, 2018, Ms. Petitt became in receipt of those very documents discussed at the hotel, provided by Puckett, in which Dr. Altman used to argue and asserted his authority to training and safety concerns during Ms. Petitt's evaluation, after a ten-

hour briefing by Puckett and Davis. Altman utilized the Puckett provided documents from the meeting to create false assertions to distort a medical evaluation.

42. On October 31, 2018, Ms. Petitt became aware of emails between Puckett and Altman regarding Altman's intended to use a "strategy" for the assessment and needed Puckett's approval to pursue his intended process.

43. On October 31, 2018, Ms. Petitt learned that Dr. Altman never interviewed Ms. Nabors, whereas his entire process was based upon Nabors' third-party hearsay of which Puckett orchestrated, briefed, prepped, and assisted Ms. Nabors in writing the report described as a living document.

44. On October 31, 2018, Ms. Petitt learned that Dr. Altman, with Puckett's knowledge used Ms. Petitt's flight hours to fraudulently deduce a bipolar diagnosis.

45. On October 31, 2018, Ms. Petitt learned that Puckett had provided Dr. Altman prior the time of evaluation, an email from VP Graham dated November 9, 2015, that Graham had premeditated his intent to give Ms. Petitt a Section-15, over five months prior to his establishing pretext, with Puckett's assistance.

46. On October 31, 2018, Ms. Petitt learned that Dr. Altman never contacted any of Petitt's personal acquaintances or work associates but relied solely on discussions with Puckett and Davis.

47. On October 31, 2018, Ms. Petitt first learned that Dr. Altman had notified Puckett on or about October 26, 2016, that he'd determined that Ms. Petitt was bipolar, yet Puckett did not advise Ms. Petitt. Instead, Dr. Altman notified Ms. Petitt of her career

ending bipolar medical diagnosis on December 24, 2016, via email *and* FedEx.

48. On October 31, 2018, Ms. Petitt learned that Puckett was working behind the scenes with Dr. Altman and attorney Jeff Wall, to manipulate the selection of the NME, beyond the collective bargaining agreement process for a Delta derived outcome, which delayed the process an additional six months,

49. On October 31, 2018, Ms. Petitt learned that Puckett paid Dr. Altman $73,923.45 for his producing a false bi-polar diagnosis, not including the cost of neuropsychological testing. Mayo Clinic invoiced approximately $3300 for their evaluation. Dr. Huff's first invoice was $2467.87. When Delta did not approve of Huff's determination, the DHS advised Huff to conduct another evaluation, and this time with "no expense spared," Huff's second "no expense spared" invoice was $4935.73.

50. November 20, 2018, Ms. Petitt learned that Puckett had met with Ms. Nabors on multiple occasions prior to the Nabors interview with Petitt. and had added included responses into her report that were Puckett written answers and not Petitt's from the interview.

51. On October 31, 2018, Ms. Petitt learned Puckett met HR investigator Nabors, after Petitt's meeting with Dickson and Graham, to begin the Section 15 process by creating pretext. On February 19, 2016, Mr. Puckett emailed Ms. Seppings, Ms. Taylor, and Ms. Nabors a copy of Complainant's SafetyReport. Mr. Puckett and Ms. Nabors then sat down and reviewed Complainant's Safety Report and determined what portions of it Ms. Nabors would investigate. Puckett and Nabors discussed the

1    topics she would address, and then Mr. Puckett prepared an outline of questions for Ms. Nabors to ask Petitt and emailed the outline to Ms. Nabors. This report became "a living document" in which Puckett added commentary prior to providing it to Dr. Altman.

52. Puckett had knowledge as to when the Section 15 would go through" *"after the meeting"* in January 2016, with Dickson and Graham, via a November 16, 2015, email. Yet he assisted with the pretext not created until March 2016.

53. December 21, 2020, Honorable Judge Morris, found evidence suggesting Delta's *"manipulation of the contractual process to achieve a desired outcome"* of enforcing a false medical diagnosis upon Petitt barring her from flight for life with a false bipolar diagnosis. Judge Morris further asserted, *"The two key actors involved here are Captain Graham and Mr. Puckett. They were the parties moving the pieces in the chess game in which Complainant found herself an unwitting player. The Tribunal finds Dr. Faulkner's role was little more than affecting the process, per Mr. Puckett's wishes."* (Petitt v Delta, 2018-AIR-00041).

ALLEGATION OF FRAUD AND DECEIT

54. Plaintiff repeats, realleges, and incorporates by reference, the allegations of Paragraphs 1 through 53 of the Complaint as if repeated herein as Paragraph 54.

55. As a direct and proximate result of Defendant Puckett's fraud and deceit, Plaintiff is entitled to an award of special damages in an amount to be shown at trial, and general

damages in an amount in excess of 10 million Dollars ($10,000,000).

WHEREFORE, Plaintiff prays FOR A TRIAL BY JURY, that summons issue, that judgment be entered in her favor and against the Defendant, and that the following relief be granted:

Plaintiff Karlene K. Petitt be awarded special damages against Defendant in the amount provided a trial, and general damages in an amount to be determined by a jury of her peers.

RESPECTFULLY SUBMITTED this 05th day of October 2021,

*s/ Karlene K Petitt*

Karlene K Petitt
19671 Military Rd. S.
SeaTac WA 98188
206-856-2445
Karlene.Petitt@gmail.com